UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

FERNANDO C. GRIFFITH,

        Petitioner,

           v.                     CAUSE NO. 3:23-CV-224-SJF

WARDEN,

        Respondent.

## OPINION AND ORDER

Fernando C. Griffith, a prisoner without a lawyer, filed a habeas corpus petition

under 28 U.S.C. § 2254 to challenge his conviction for murder, arson, and burglary

under Case No. 41C01-5-CF-114. Following a jury trial, on September 20, 2001, the

Johnson Circuit Court sentenced him to 36 years imprisonment in addition to a term of

life imprisonment without parole.

In deciding this habeas petition, the court must presume the facts set forth by the

state courts are correct unless they are rebutted with clear and convincing evidence. 28

U.S.C. § 2254(e)(1). The Indiana Supreme Court summarized the evidence presented at

trial:

> The Greenwood Fire Department responded to a fire at the home of Lloyd
> and Judy Georges early on May 19, 2000. Investigators discovered the
> bodies of Lloyd and Judy, and autopsies confirmed that stab wounds were
> the cause of death. Investigators further determined the fire was
> intentionally set with an accelerant. Jewelry was missing from the house
> along with Lloyd's wallet. The Georges' car was also missing from the
> garage.

The Greenwood police learned that a witness saw a black male carrying a gas can in the front yard of the Georges' house and walking into the front door of their home. A neighbor informed police that he saw the Georges' car pulling out of their garage the same morning around 5:05 a.m. The police found the car ablaze a few days later and ruled it arson because accelerant was used to fuel the fire.

Assisting the Greenwood Police, Indianapolis Officer Jack Tindall and Detective Thomas Richard Tudor went to Griffith's apartment building around 10:15 p.m. on May 21st, where they noticed that Griffith smelled of burnt smoke and had band-aids on his hands and fingers. At Detective Tudor's direction, Officer Tindall transported Griffith to the Greenwood Police Department where Officer John Laut noticed the strong smoke odor and the band-aids while booking Griffith. Upon further inspection, Laut found one of Lloyd's rings in Griffith's pocket. Griffith was arrested between 10:20 p.m. and 11:10 p.m.

Greenwood Detective Patti Cummings directed Officer Tindall to bring Griffith to the interrogation room for questioning. When Griffith arrived, Detective Cummings advised him of his *Miranda* rights during the early morning hours of May 22. Griffith was held at the Greenwood Police Department before transport to the Johnson County Jail, which caused his name to be excluded from the jail population list of suspects who were to appear before the Magistrate within forty-eight hours. Later that day, police transported Griffith to the Johnson County Jail.

Hollis Kehrt was also arrested in connection with the present case. On May 23rd, the Greenwood Police, a captain from the Johnson County Jail, and the Johnson County Prosecutor wired Kehrt and placed him in the cell with Griffith to obtain "incriminating information" about the Georges' murder. Police placed Kehrt in the cell with Griffith before he appeared before a magistrate. The police were unable to collect any information, however, because they could not decipher any data from the wire.
The following day, police asked Griffith's girlfriend Jamie Young to make a controlled call in an effort to obtain incriminating information from Griffith. Though police instructed Young not to reveal that the call was controlled, she immediately did so, and Griffith revealed nothing.
The Greenwood Police prepared a probable cause affidavit on May 22nd, and revised it on May 23rd. On May 24th, Magistrate Craig Lawson conducted an initial hearing and determined that probable cause existed for Griffith's arrest.

The following day, Griffith's wife Elizabeth phoned Greenwood police and told them that Griffith wanted to speak with them. One day later, a judge granted an order to draw a sample of Griffith's blood. While en route to the hospital for the blood draw, Griffith confirmed that he wanted to speak with the Greenwood police.

At the later meeting with the Greenwood police, officers informed Griffith of his rights, including his right to counsel and right to remain silent, and Griffith signed a waiver. Griffith then confessed to the murder of Lloyd and Judy Georges and the burglary and arson of their home. Thereafter, the State charged Griffith with two counts of murder, one count of burglary as a class B felony, and one count of arson, a class B felony. A jury found him guilty of all counts. The court sentenced Griffith to life without parole for the murders, and two consecutive eighteen-year sentences for the counts of burglary and arson.

*Griffith v. State*, 788 N.E.2d 835, 838–39 (Ind. 2003); ECF 8-5 at 4-5.

In the petition, Griffith asserts claims of trial court error, trial counsel error, and appellate counsel error. The court will first consider whether Griffith has waived his claims by declining to brief them and also address the pending motion to appoint counsel (ECF 37). The Criminal Justice Act, 18 U.S.C. § 3006A(a)(2)(B), permits the appointment of counsel in a habeas corpus case, if "given the difficulty of the case and the litigant's ability, [he] could not obtain justice without an attorney, he could not obtain a lawyer on his own, and he would have . . . a reasonable chance of winning with a lawyer at his side." *Winsett v. Washington*, 130 F.3d 269, 281 (7th Cir. 1997).

On May 31, 2023, the Warden filed a motion seeking leave to file a response addressing only the issues of timeliness, procedural default, and cognizability as well as a proposed response. ECF 8, ECF 9. The court granted the motion but advised that it might order a round of briefing on the merits after reviewing the parties' briefing on the procedural issues and set a deadline for Griffith to reply to the procedural arguments.

ECF 10. On June 13, 2023, Griffith filed a motion to appoint counsel. ECF 11. The court denied this motion, finding that his filings demonstrated that he remained reasonably competent at preparing legal documents on his own. ECF 12. The court further noted that it would be in a better position to assess Griffith's ability to litigate and whether he would have a reasonable chance at success with counsel after reviewing the parties' briefs and the State court record. *Id.* On November 28, 2023, Griffith filed a motion to extend the deadline to file a traverse and requested appointment of counsel due to limited access to the law library. ECF 21. The court denied the request for counsel for the same reasons and also noted that limited access to the law library may have delayed his efforts but did not appear to prevent Griffith from preparing a traverse. ECF 22. In total, Griffith filed six motions to extend, and the court granted a series of extensions that allowed Griffith about seven months in total to prepare a traverse. ECF 13, ECF 15, ECF 17, ECF 19, ECF 21, ECF 23, ECF 24.

On December 29, 2023, Griffith filed a traverse that responded to each of the procedural arguments. ECF 25. Though he was not required to address the merits of claims, the traverse includes headings for Grounds I-IV as designated in the petition. In that section of the traverse, Griffith addressed the merits of Ground I, but, with respect to the other grounds, he vaguely represented that "[d]ue to time constraints and State-created impediments, Griffith is unable to complete the remainder of his arguments in reply." ECF 25-1 at 11-15. On May 3, 2024, the court found Griffith's procedural arguments sufficiently persuasive as to order another round of briefing on the ineffective assistance of counsel claims and the filing of the complete State court record.

On August 1, 2024, the Warden filed a brief addressing the ineffective assistance of counsel claims and the complete State court record. ECF 31, ECF 33, ECF 34. Pursuant to the local rules, Griffith's supplemental traverse was due 28 days later on August 29, 2024. N.D. Ind. L. Cr. R. 47-2. Nevertheless, on December 4, 2024, the court ordered Griffith to file a supplemental traverse by January 17, 2025, and cautioned him that, if he did not respond by that deadline, the court might resolve the habeas petition without the benefit of further briefing. ECF 36. That deadline came and went without any filings in this case until September 16, 2025, when Griffith filed another motion to appoint counsel, which remains pending. ECF 37.

Significantly, the deadline to file a supplemental traverse has long passed, and Griffith has neither requested nor demonstrated good cause to extend or to reset this deadline. Further, while the trial court error claims are sufficiently developed for meaningful review in the petition and in the initial traverse, the same cannot be said for the claims of trial counsel error and appellate counsel error. For example, in the petition, Griffith faults trial counsel for "failing to argue that the trial court exceeded its statutory [authority] and abused its discretion when it permitted the State to make substantive amendments to the charging information several months beyond the omnibus date." ECF 1 at 8. However, he does not identify any statute, describe the purported amendments, or explain how he was harmed by trial counsel's purported failure to assert an objection to the amendments. Additionally, the court expressly asked the parties to address the ineffective assistance of counsel claims, expressly warned Griffith about the potential consequences for declining to do so, and expressly

informed Griffith that it was not inclined to appoint counsel for him until after this case was fully briefed. Given this lack of development, it appears that Griffith has waived his claims of trial counsel error and appellate counsel error. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.'); *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

Out of an abundance of caution, the court will also consider whether Griffith required assistance of counsel to prepare a supplemental traverse. In the prior order denying counsel, the court found him reasonably competent to prepare filings on his own by relying on his seven motions to extend filed with the Indiana Court of Appeals on post-conviction review and on the motion to appoint counsel. The court has now had the benefit of reviewing his initial traverse and the State court record. The State court record indicates that Griffith prepared motions on his own in State criminal proceedings even though he also had appointed counsel. For example, he prepared a 39-page handwritten motion to reconsider the order denying his motion to suppress his confession that contains detailed facts, legal citations, and cogent arguments. ECF 34-8 at 121-60. On post-conviction review, he prepared a 36-page motion to amend his petition in response to the State's motion for a more definite statement, and a 6-page motion for summary judgment with a 19-page affidavit attached. ECF 31-1, ECF 31-4,

ECF 31-5. He also conducted multi-day depositions and examined witnesses on his own at a multi-day evidentiary hearing. ECF 33-2 through ECF 33-8. And, as detailed above, his initial traverse in this case adequately and persuasively addressed the procedural arguments posed by the Warden. Taken together, these documents demonstrate Griffith's grasp of the relevant facts and law and his ability to develop them into rational arguments, so it is unclear why Griffith could not have prepared a supplemental traverse on his own. Perhaps even more importantly, the record leaves very little doubt that Griffith could have timely notified the court if he was unable to prepare a supplemental traverse on his own and needed more time or assistance to do so.

Consequently, the court finds that Griffith did not need counsel to prepare a supplemental traverse and that Griffith has waived his ineffective assistance of counsel claims by declining to develop them either in the petition or in the traverse.[1] Further, even if he did need assistance to prepare a supplemental traverse, Griffith declined to notify the court in a timely manner and offers no explanation for this substantial delay. Nevertheless, the court would likely appoint counsel for Griffith if this case were to proceed beyond the briefing stage. *See* Rule 8(c) of the Rules Governing Section 2254 Cases ("If an evidentiary hearing is warranted, the judge must appoint an attorney to represent a petitioner who qualifies to have counsel appointed under 18 U.S.C. §

---

[1] Given this finding, the court need not further address the parties' arguments relating to procedural default, which pertain primarily to the ineffective assistance of counsel claims. ECF 8 at 15-20.

3006A."). However, as detailed below, the court finds that the claims of trial court error are without merit. Therefore, the court denies the motion to appoint counsel.

TIMELINESS

The court considers the Warden's argument that Griffith's petition is untimely.

The statute of limitations for habeas petitions states as follows:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

Based on review of the petition, the date on which the judgment became final is the applicable starting point for calculating timeliness. His direct appeal culminated

with the Indiana Supreme Court's decision on May 16, 2003. ECF 8-5. Therefore, his conviction became final for purposes of 28 U.S.C. § 2244(d)(1)(A) when the time for petitioning the Supreme Court of the United States for a writ of certiorari expired on August 14, 2003. *See* U.S. Sup. Ct. R. 13(1) (petition for writs of certiorari must filed within 90 days after entry of judgment); *Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009) (when a State prisoner does not petition the Supreme Court of the United States on direct appeal, his conviction becomes final when the time for filing a petition expires).

Tolling of the limitations period began on the date on which Griffith's petition for post-conviction relief was properly filed in the Johnson Circuit Court. *See* 28 U.S.C. § 2244(d). According to the State court docket sheet, he filed this petition on April 26, 2004. ECF 8-6 at 2. However, Griffith argues that the prison mailbox rule should apply to this State court filing. He has submitted evidence indicating that he handed this petition to a counselor for mailing on March 5, 2004, and the Warden does not dispute this evidence. ECF 25-2. "[T]he mailbox rule applies to a state pro se prisoner's post-conviction filings unless the state where the prisoner was convicted has clearly rejected the rule." *Ray v. Clements*, 700 F.3d 993, 1004 (7th Cir. 2012). The State of Indiana has not rejected but has instead adopted the prison mailbox rule. *Dowell v. State*, 922 N.E.2d 605, 607 (Ind. 2010) ("[T]his Court has regularly applied the prison mailbox rule in various orders . . . . We now make explicit the rule as applied in our previous orders."). Consequently, the court finds that Griffith's petition for post-conviction relief was properly filed on March 5, 2004 – 204 days after his conviction became final.

The State post-conviction proceedings culminated in the dismissal of his appeal on November 1, 2022. ECF 8-16. Griffith filed the habeas petition 137 days later on March 18, 2023. ECF 1 at 13. Consequently, only 341 days of the one-year limitations had elapsed when Griffith filed the habeas petition. Therefore, the court finds that the habeas petition is timely.

<u>STANDARD OF REVIEW</u>

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 575 U.S. 312, 316 (2015).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> [This] standard is intentionally difficult to meet. We have explained that clearly established Federal law for purposes of §2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions. And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Woods,* 575 U.S. at 316. Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

DISCUSSION

Ground I -- Warrantless Arrest

Griffith argues that he is entitled to habeas relief because Officer Tindall lacked probable cause to arrest him and that evidence obtained as a result of his arrest should have been excluded at trial. He asserts that the Indiana Supreme Court improperly relied on evidence obtained by the police after his arrest when it found probable cause. The Warden argues that this argument is not a valid basis for habeas relief because the State court provided a mechanism for review. "As long as a habeas petitioner enjoyed an opportunity for full and fair litigation of a Fourth Amendment claim" in state court, federal habeas review of the claim is barred." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 552 (7th Cir. 2008). "As a general principle, absent a subversion of the hearing process, we will not examine whether the state courts made the right decision." *Id.*

Griffith specifically argues that he did not receive a full and fair hearing because the Indiana Supreme Court did not decide "by whom, when, and where exactly was his warrantless arrest made." ECF 1 at 3. To Griffith's point, the Indiana Supreme Court

merely noted that the arrest occurred "between 10:20 p.m. and 11:10 p.m." on May 21, 2000, during which Griffith was at his apartment building and taken to the Greenwood Police Department office. ECF 8-5 at 4-5. However, the Indiana Supreme Court relied on the collective knowledge doctrine, rendering more specific determinations unnecessary, which the court will discuss in greater detail below. *Id.* at 6. Consequently, the court cannot find that the State courts deprived Griffith of a full and fair hearing by declining to make more specific determinations. Nevertheless, the court will review the decision of the Indiana Supreme Court for the sake of completeness.

"[I]n order to make an arrest without a warrant, the police must have probable cause to reasonably believe that a particular individual has committed a crime." *United States v. Rucker*, 138 F.3d 697, 700 (7th Cir. 1998) "A determination of whether there was probable cause requires an evaluation of the totality of the circumstances." *Id.*

> The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action. There is no Fourth Amendment violation if the knowledge of the officer directing the stop, search, or arrest—or the collective knowledge of the agency for which he works—is sufficient to constitute probable cause. In order for the collective knowledge doctrine to apply, (1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it.

*United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010).

On May 30, 2000, Detective Patti Cummings of the Greenwood Police Department submitted a probable cause affidavit. ECF 34-6 at 252-56. In that affidavit,

she attested to obtaining the following information prior to May 21, 2000, the date on which Griffith was arrested. On May 19, 2000, she went to the victims' residence where a fire had occurred. *Id.* at 252. A fireman informed her that the burn patterns indicated the use of an accelerant, which, in turn, indicated that the fire had been set intentionally. *Id.* She saw the deceased victims inside the residence. *Id.* On the same day, Detective Cummings spoke with the victim's next-door neighbor, who informed her that Mr. Georges ran a landscaping business and that one of his employees was a black male named Val whom she had seen at the victim's residence on several occasions. *Id.* at 252. Mr. Georges told her that Val was a stripper and had asked her to make a stripping costume for Val. *Id.*

On May 20, 2000, Detective Cummings observed an autopsy in which a physician informed her that both victims had multiple stab wounds. *Id.* at 252. She spoke with Detective Smith who had spoken with Mr. Georges' friend, David Meek. *Id.* at 253. He said that Mr. Georges had brought a black man named Val to his residence and told him that he met Val at the Unicorn Club, where Val worked as a dancer. *Id.* According to Meek, on May 18, 2000, Mr. Georges told Meek that his relationship with Val had "gone sour", that he owed Val twenty-five dollars and that he intended to "take his sweet time" paying him. *Id.* He also said that Val wanted him to buy a car but that he did not intend to do so. *Id.*

Also on May 20, 2000, Detective Cummings spoke with the victims' son who had also seen Val at the victims' residence and identified a photograph of Griffith as depicting Val. *Id.* She also spoke with a newspaper deliverer who told her that, at about

13

5:15 a.m., she saw a black male walking to the victims' residence with a red gas can under his arm. *Id.* The Greenwood Police Department notified her that the Georges' vehicle had been found on fire. *Id.* at 255. On the same day, the Greenwood Police Department contacted other agencies to assist it in locating Griffith. *Id.* at 254. On May 22, 2000, Detective Cummings spoke with Officer Roller, who told her that, on the afternoon of May 18, a neighbor saw a black man and a white man arguing on the front porch of the victim's residence. *Id.* at 253.

On April 9, 2001, Griffith, by counsel, filed a motion challenging his arrest and subsequent detention and seeking to suppress the evidence discovered as a result. ECF 34-8 at 23-27. At an evidentiary hearing on May 31, 2001, Detective Tudor testified that he worked for the Indianapolis Police Department but that, on May 20, 2000, the chief of the Greenwood Police Department had asked his department to assist in locating Griffith. ECF 34-13 at 13-37. On May 21, 2000, he went to the Unicorn Club, where a supervisor told him that he last saw Griffith on May 18, 2000. *Id.* Griffith told the supervisor that "his Sugar Daddy[2] [was] going to leave him or give him money and a car." *Id.* The supervisor had seen Griffith with the "Sugar Daddy" at the club several times and described him as a "white male from Greenwood in his late fifties to early sixties." *Id.* Griffith left the club after midnight on May 19, 2000. *Id.*

---

[2] This term is defined as "a well-to-do usually older man who supports or spends lavishly on a mistress, girlfriend, or boyfriend." Merriam-Webster, https://www.merriam-webster.com/dictionary/sugar%20daddy (last visited on November 14, 2025).

At 10:00 p.m. on May 21, 2000, he met with other police officers, including Officer Tindall, in a bank parking lot. *Id.* Officer Tindall told him he was familiar with Griffith's appearance. *Id.* At 10:15 p.m., the police officers went to Griffith's apartment building with Officer Tindall walking over to the west side of the building. *Id.* Less than a minute later, Officer Tindall informed him over the radio that he had detained Griffith. *Id.* He observed several bandages on Griffith's hands, and he told Officer Tindall to put Griffith in his police vehicle. *Id.* He notified the chief of the Greenwood Police Department of Griffith's detention, and, at 11:10 p.m., the officers from the Greenwood Police Department arrived. *Id.*

Officer Tindall testified that he worked for the Indianapolis Police Department and that Detective Tudor had asked him to assist with looking for Griffith. *Id.* at 38-72. He went to the rear entrance of the apartment building because he knew it was more likely to be unsecured. *Id.* As he approached the rear entrance, Griffith stepped out of it. *Id.* Officer Tindall recognized Griffith, drew his weapon, and ordered him to the ground. *Id.* Griffith complied, and Officer Tindall handcuffed him and placed him in his police vehicle at Detective Tudor's direction. *Id.* Officer Tindall smelled a strong smoky odor on Griffith and found Mr. Georges' ring in Griffith's pocket. *Id.*

Officer Payne testified that he worked for the Greenwood Police Department. *Id.* at 74-91. He arrived at the apartment building at about 11:20 p.m. *Id.* Detective Cummings directed him to ask Officer Tindall to take Griffith to the police station, which he did at about midnight. *Id.* While Griffith was not free to leave, Officer Payne did not consider him to be under arrest. *Id.* He believed that Detective Cummings

15

arrested him at the police station. *Id.* Before arriving at the apartment building, Officer

Payne had spoken with Mr. Georges' friend, Darrell Jenkins. *Id.* Jenkins said that he had

spoken with Mr. Georges on May 18, 2000, and that Mr. Georges said that he and

Griffith had a "falling out" and that he intended to fire Griffith. *Id.* At trial, Officer Laut

testified that he found Mr. Georges' ring in Griffith's clothing at booking. *Id.*

On June 19, 2001, the parties stipulated that Griffith's arrest occurred "at the

point in time when he was placed in an Indianapolis Police Department squad car by

Officer Jack Tindall." ECF 34-8 at 48. On July 19, 2001, the trial court denied the motion

to suppress, finding probable cause to arrest Griffith. *Id.* at 87-92.

On direct appeal, Griffith argued that the trial court should have suppressed his

confession because it was the product of a wrongful arrest. ECF 8-3 at 25-29. The

Indiana Supreme Court defined probable cause and reasoned that probable cause could

"rest on collective information known to the law enforcement organization as a whole,

and not solely on the personal knowledge of the arresting officer." ECF 8-5 at 6. As

evidence supporting probable cause, the appellate court cited Mr. Georges'

conversation with his friend, the victims' son identification of Griffith as Val, a

neighbor's report that she saw Mr. Georges arguing with a black man, a witness seeing

a black male carrying a gas can. It also noted the smoky odor, the bandaged hands, and

Griffith's possession of Mr. Georges' ring. *Id.* The appellate court concluded that the

arresting officer had probable cause to believe that Griffith murdered the Georges and

also committed burglary and arson. *Id.*

16

After thoroughly reviewing the record, the court cannot find that the State court made an unreasonable determination on the wrongful arrest claim. To start, the court relies on the parties' stipulation regarding the moment of arrest. Though Griffith attempts to limit the probable cause inquiry to facts personally known by Officer Tindall, he offers no explanation as to why the collective knowledge doctrine would not have applied to Officer Tindall, who arrested Griffith at the direction of Detective Tudor and the Greenwood Police Department. Further, it is readily apparent that Detective Tudor, Officer Tindall, and the Greenwood Police Department collectively had sufficient evidence to establish probable cause at the moment of arrest; specifically, investigation of the crime scene, which established the likelihood of arson; an autopsy of the victims, which established the likelihood of intentional murders; the discovery of the Georges' burned vehicle, which established a likelihood of burglary and second incident of arson. As to Griffith's involvement, law enforcement had collectively spoken to one witness who identified a black man carrying a gas can on the morning of the residential fire, several witnesses who identified Mr. George as having a particularly special relationship with a black man named Val as both an employer and as a "Sugar Daddy," one witness who identified a photograph of Griffith as Val, two witnesses who said they heard from Mr. Georges that he had had a falling out with Griffith the day before his murder, and another witness who said he heard from Griffith that he believed that his "Sugar Daddy" might leave him instead of giving him a car and money. After Officer Tindall detained him but before he placed Griffith in the police vehicle, Officer Tindall also observed Griffith's bandaged hands. It was not

17

unreasonable for the State court to have concluded that a reasonable person could have believed that Griffith had committed a crime based on this evidence.

To Griffith's point, the Indiana Supreme Court erred by relying on some evidence that the Greenwood Police Department did not obtain until after his arrest, including the witness who observed a white man and a black man arguing on the front porch and the discovery of Mr. Georges' ring in Griffith's clothing. Further, the probative value of the smoky odor is questionable given that Griffith had cooked with a charcoal grill immediately before his arrest and that some passage of time had occurred since the incidents of arson. However, even excluding this evidence, the Indiana Supreme Court had an ample evidentiary basis to find probable cause for Griffith's arrest. Therefore, the unlawful arrest claim is not a basis for habeas relief.

<u>Grounds II & III</u>

Griffith argues that he is entitled to habeas relief because he did not receive a timely probable cause determination and because the police continued to investigate his crimes during this period of unlawful detention. He contends that the police used the results of this investigation to obtain search warrants and to obtain evidence used against him at trial. This argument appears to invoke the doctrine that arrestees are presumptively entitled to a judicial determination of probable cause within 48 hours of their arrest. *See Ortiz v. City of Chicago*, 656 F.3d 523, 539 (7th Cir. 2011).

This claim is somewhat perplexing given that the trial court and the Indiana Supreme Court both found that Griffith had been improperly held for 63 hours before receiving a probable cause determination before a magistrate. ECF 8-5 at 6-7; ECF 34-8

at 87-92. Griffith's true concern thus appears to be that the State courts should have suppressed evidence as a result of the unreasonably delay. Notably, the trial court suppressed any evidence obtained after 48 hours of detention but before the probable cause determination, and the Indiana Supreme Court declined to also suppress Griffith's confession because it occurred two days after the probable cause determination and because Griffith initiated the meeting with the interviewing officers. *Id.*

Griffith cannot prevail on this suppression claim because he cannot show that the State courts' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Significantly, the Supreme Court of the United States has never held that suppression is an appropriate remedy for a delayed judicial determination of probable cause. *See United States v. Pabon*, 871 F.3d 164, 179 (2d Cir. 2017) ("Neither the Supreme Court nor this Court has yet determined whether a violation of *McLaughlin*'s 48–hour rule is an appropriate basis for suppression."); *Lawhorn v. Allen*, 519 F.3d 1272, 1290 (11th Cir. 2008) ("The issue of whether suppression is an appropriate remedy for a *Riverside/Gerstein* violation is unresolved by the Supreme Court although the Supreme Court has held that exclusion is appropriate for other constitutional violations."); *United States v. Sholola*, 124 F.3d 803, 821 (7th Cir. 1997) ("[T]he Supreme Court specifically declined to reach this issue"); *Edmonson v. Harrington*, 2013 WL 2178320, at *7 (N.D. Ill. May 20, 2013) ("The United States Supreme Court has never held that a defendant is entitled to the suppression of statements made after an alleged *Riverside / Gerstein*

violation."). To the contrary, the Supreme Court has stated, "Whether a suppression remedy applies [to failures to obtain authorization from a magistrate for a significant period of pretrial detention] remains an unresolved question." *Powell v. Nevada*, 511 U.S. 79, 85 (1994).[3] Therefore, the claim relating to delayed judicial determination of probable cause is not a basis for habeas relief.

Griffith also argues that he is entitled to habeas relief because he did not receive an initial hearing as set forth in Ind. Code §§ 35-33-7-1 to 35-33-7-5. He asserts that at the first initial hearing, the magistrate did not adequately notify him of the charges or inquire about his legal representation. Notably, the magistrate hearing took place on May 24, 2000, and the prosecution did not file charges until May 30, 2000. ECF 8-1 at 2; ECF 34-11 at 4-6. On May 31, the trial court held an initial hearing in which the trial court explained the charges to Griffith and appointed counsel on his behalf. ECF 34-11 at 7-19. The implication of this argument appears to be that the State courts should have suppressed the evidence obtained between the first and second initial hearing.

On direct appeal, Griffith raised a somewhat similar argument, contending that the failure to appoint counsel for him during the magistrate hearing violated his rights under the Equal Protection Clause and that his confession should have been suppressed. ECF 8-3 at 29-33. The Indiana Supreme Court rejected this argument, noting "the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons," and that the Sixth

---

[3] According to Westlaw, this language appears in an unnumbered footnote.

Amendment right to appointed counsel attaches only when formal charges have been filed. ECF 8-5 at 8.

Notably, Griffith cannot obtain habeas relief based solely on violations of State law. *See Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002) ("Federal habeas relief is only available to a person in custody in violation of the United States Constitution or laws or treaties of the United States and is unavailable to remedy errors of state law."). Nor is it apparent that the State courts violated State law given that Griffith received a second initial hearing on May 31, 2000.[4] Further, the Indiana Supreme Court correctly found that the Sixth Amendment right to appointed counsel attaches only at the moment when charges are filed. *See Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198, (2008) ("The Sixth Amendment right of the accused to assistance of counsel in all criminal prosecutions is limited by its terms: it does not attach until a prosecution is commenced. We have, for purposes of the right to counsel, pegged commencement to the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."). It also seems self-evident that courts are not required to inform individuals of criminal charges before the prosecution has filed such charges given the practical impossibility of doing so, and Griffith has cited no Supreme Court case to the contrary.

---

[4] Indeed, it strikes the court that the initial hearing held by the magistrate served only as a prompt determination of probable cause as required by the Fourth Amendment and that the purpose of the second initial hearing was to comply with State statutory and other constitutional requirements, including the Sixth Amendment right to appointed counsel for indigent criminal defendants.

Griffith may also be arguing that the prosecution unreasonably delayed the filing of charges against him, but such an argument invokes the Sixth Amendment right to a speedy trial. *See United States v. MacDonald*, 456 U.S. 1, 7 (1982) ("In addition to the period after indictment, the period between arrest and indictment must be considered in evaluating a Speedy Trial Clause claim."). Griffith did not fairly present a speedy trial claim to the State courts, and so he cannot obtain habeas relief based on such a claim. *See Perruquet v. Briley*, 390 F.3d 505, 513–14 (7th Cir. 2004) ("Presenting the same claim in state court that he later seeks to make in federal court means that the petitioner must alert the state courts that he is relying on a provision of the federal constitution for relief."). Moreover, it seems unlikely that Griffith would have prevailed on such a claim given that he received a jury trial within fifteen months of his arrest, the complexity of the investigation and evidence, Griffith's pursuit of two separate motions to suppress and a motion to reconsider, and the absence of any prior assertion of this right by Griffith. *See United States v. Hills*, 618 F.3d 619, 629 (7th Cir. 2010) ("A Sixth Amendment claim of a speedy trial violation is analyzed by considering whether delay before trial was uncommonly long, whether the government or the criminal defendant is more to blame for that delay, whether, in due course, the defendant asserted his right to a speedy trial, and whether he suffered prejudice as the delay's result . . . . When analyzing which party is more to blame for the delay, the reason for the delay is generally the focal inquiry."). Therefore, the claim that Griffith did not receive a proper initial hearing is not a basis for habeas relief.

## CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Griffith to proceed further.

For these reasons, the court DENIES the habeas corpus petition (ECF 1); DENIES the motion to appoint counsel (ECF 37); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on November 17, 2025.

s/Scott J. Frankel
Scott J. Frankel
United States Magistrate Judge